**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREAT AMERICAN E&S INSURANCE COMPANY,** | ) ) ) | |
| **Plaintiff/Counter-Defendant,** | ) ) | |
| **v.** | ) ) | **No. 17 C 6658** |
| **POWER CELL LLC, d/b/a ZEUS BATTERY PRODUCTS,** | ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant/Counter-Plaintiff.** | ) ) ) | |

## MEMORANDUM OPINION AND ORDER

Power Cell, LLC, d/b/a/ Zeus Battery Products ("Zeus") is a battery manufacturer. In this lawsuit, Zeus's insurer, Plaintiff Great American E & S Insurance Company, seeks a declaration that it has no duty to provide a defense to Zeus in a suit filed against Zeus by one of its customers, Spring Windows Fashions LLC. Both sides seek summary judgment on a number of issues. For the reasons that follow, the court concludes that Great American has a duty to defend Zeus in the Spring Windows lawsuit and this duty extends to Zeus's affirmative claims.

## FACTS

Though Great American formally objects to many the statements in Zeus's Rule 56.1 statement, the facts of this case are largely undisputed.[1] Great American is an insurance company formed in Delaware with its principal place of business in Ohio. (Great American's Response to Zeus's LR 56.1 Statement [47] ("GA 56.1 Resp.") ¶ 1.) Zeus is an Illinois limited liability company whose members are Illinois citizens and whose principal place of business is in Illinois. (*Id.* ¶ 2.) The origin of the parties' dispute is a product recall on the part of Spring Window Fashions, LLC ("SWF"), a business that sells battery-operated window shades and coverings in the United States. *See generally Power Cell LLC v. Spring Window Fashions, LLC*, No.

---

[1] To many of Zeus's Rule 56.1 Statements, Great American responds by saying that it does not dispute.

17 C 4382, 2018 WL 1911765 (N.D. Ill. April 23, 2018) (Leinenweber, J.)  After some customer complaints about the window shades, SWF initiated the recall, assigning blame for the window shade failures to the Zeus batteries.

Zeus believes the window products' failure was a product of a design flaw in the SWF product, and that SWF's false recall notices have harmed Zeus's reputation in the industry.  2018 WL 1911765, *1.  When Zeus sued SWF, seeking recovery for the alleged misrepresentations under various theories, SWF counterclaimed, alleging breaches of warranty and negligence and demanding indemnification for the cost of replacing the batteries in the window products.  (GA 56.1 Resp. ¶ 5; Answer and Counterclaim of Spring Window in 17 C 4382, Exhibit B to Complaint [1-2].)  In the lawsuit before this court, Zeus seeks a declaration that its insurer, Defendant Great American, is liable to provide coverage for losses SWF is seeking to recover from Zeus.

### A.    SWF Reports of Battery Performance Issues

In September 2016, March 2016, July 2016, and August 2016, Zeus and SWF entered into a series of purchase orders in which Zeus, a private labeler of batteries, supplied SWF with AA lithium ion batteries for use in SWF's motorized window shade products.  (GA 56.1 Resp. ¶¶ 6, 7.)  On June 7, 2016, a customer of one of the retail stores that distribute SWF's products complained about a problem involving the batteries for one of those products; the customer reported that one of the battery tubes was so hot that it almost burned his hands, and the batteries inside were charred and melted.  (*Id.* ¶ 8; Incident Report, Exhibit H to GA 56.1 Resp.)  SFW prepared an incident report about the June 7 complaint, but did not immediately notify Zeus.  (*Id.* ¶ 9; Incident Report, 6/7/2016 , Exhibit H to GA 6.1 Resp.)

Four more complaints followed.  For the first two of these, in September 2016, SWF again prepared incident reports, but did not notify Zeus.  (*Id.* ¶ 11.)  Zeus did receive reports concerning two more incidents, the first in November 2016 and another in February 2017.  (*Id.*)  Zeus contends that the report it received on November 11, 2016 did not identify the "subject battery" as the cause of the incident (Zeus Local Rule 56.1 Statement ("Zeus 56.1 Stmt.") [18] ¶ 12), but

in the e-mail message Zeus cites, SWF described "a very serious incident with Zeus batteries" resulting in "damages depicted in the attached photos." (Nov. 11, 2016 e-mail message from Keith Carlson, Exhibit 1 to Decl. of Mills Rendell [19], at 6.) The message stated, further, that SWF was "very concerned" about "safety and liability" issues, as well as SWF's own reputation. (*Id.*) The message noted that this was the "fourth major concern [SWF had] had with Zeus batteries in about a month," the other three involving "leaking batteries," and that "all indications" concerning testing of the SWF product suggested "a catastrophic battery failure." (*Id.* at 7.) The court concludes that Zeus was in fact on notice as of November 2016 that its batteries were involved in a product failure.

Great American insists that Zeus knew this as early as June 2016 (GA 56.1 Resp. ¶ 12), but the materials Great American cites do not support this assertion. The June 1, 2016 e-mail message Great American cites is an internal exchange at SFW describing a complaint from a customer of a leaking battery; there is no indication that Zeus batteries were identified in any such complaint. Keith Carlson of SWF forwarded the exchange to Gina Galante at Zeus, requesting that Zeus, like a competitor battery source, provide SFW with a "no leak guarantee." (June 1, 2016 Carlson e-mail, Exhibit C to GA 56.1 Resp.; Galante Dep., Exhibit A to GA 56.1 Resp. at 50:8-22.)

On June 13, 2016, Herb Holmstedt and Bert Olsen of Zeus met with six representatives of SWF. (Holmstedt Memo, June 13, 2016, Exhibit B to GA 56.1 Add'l.) According to a memo prepared by Holmstedt after the meeting, the parties met "to review patent concerns, discuss the recent battery quality issues, the battery leak warranty and new programs," with patent concerns being the "top priority." (*Id.*) The three quality issues identified in Holmstedt's memo were one "battery that a customer claimed leaked" a set of batteries that were "dead on arrival"—that is, they did not function; and a recent complaint about a "melting case." (*Id.*) The memo notes that it was not clear that Zeus was the source of the battery that had leaked. (*Id.*) At the conclusion of the meeting, Zeus agreed to provide SWF with "a copy of the battery leak test that the products

underwent" at the direction of the battery manufacturer's sales agent, as well as its standard warranty and a "no leak" guarantee. (*Id.* at 31:23-32:5; 33:17-34:3.) SWF also planned to conduct its own leak test. (Holmstedt Memo at 2.)

In a June 15, 2016 e-mail, Zeus engineer Kevin Oh notified Zeus's Director of Sales that Oh wanted to "receive the battery(s) with quality issue for us to evaluate and provide some feedback, given that batteries were from ZEUS." (Kevin Oh e-mail, June 15, 2016, Exhibit I to GA 56.1 Resp.) Zeus asserts, however, that after the June 13, 2016 meeting, SWF "never provided Zeus with any further information concerning the leaking battery, the batteries with short life [or] the melting case." (Galante Declaration, Exhibit A to Zeus Response to GA 56.1 Add'l.) In particular, SWF never advised that Zeus was the source of any of the returned batteries, or that any Zeus battery was the cause of any failure. (Galante Dep. 31:23 – 35:24.) As a result, Zeus asserts, Zeus did not engage in any "follow up" with SWF on these issues. (Zeus Resp. to GA 56.1 Add'l. ¶ 5.)

In an August 8, 2016 e-mail, Joe Weibler of SWF forwarded photos of damaged batteries. (Weibler e-mail, Aug. 8, 2016, Exhibit J to GA 56.1 Resp.) Ms. Galante acknowledged in her deposition that photos attached to the message are of "Zeus batteries," and show "leaking batteries." (Galante Dep. 73:1-4.) The message states that SWF had "some serious concerns about product reliability/durability and its potential impact on [SWF's] final product." (Id. 72:9-73:12.) The e-mail also advised that Ms. Galante could expect to receive "additional input and questions." (Weibler E-mail, Aug. 6, 2016, Exhibit J to GA 56.1 Resp.) Ms. Galante testified that to her knowledge, there was no further word from SWF; and although "a leaking battery [has] the potential to cause damage," batteries are not always the cause of problems with products in which they are installed, so she was not concerned by the photos in the absence of a formal incident report. (*Id.* 75:14-76:18; 79:12-80:2.)

As noted, in November 2016, SWF told Zeus about an incident with the Zeus batteries in a Menard's store display and claimed a "catastrophic battery failure." Zeus received formal

incident reports on that date as well. (Galante Dep., 86:16-19.) On receipt of the November 11, 2016 e-mail, Zeus arranged for its Chief Technology Officer, Peter Foret, and a sales representative, Bert Olson, to meet with SWF personnel. (November 11, 2016 e-mail from Gina Galante, Exhibit 2 to Rendell Decl. [19], at 9.) Until that date, SWF had never refused to accept any shipment of Zeus batteries, had never refused to pay an invoice from Zeus, and had never requested a refund from Zeus. (GA Resp. ¶ 15.) In an internal e-mail, Brad Rendell of Zeus asked his colleagues, "What is the story? Is this misuse by the customer or bad batteries? Is this the first time we have heard about these issues? What about the June 7th issue?" (Brad Rendell e-mail, November 13, 2016, Exhibit K to GA 56.1 Resp.)

The following day (November 14, 2016), SWF advised Zeus by e-mail that SWF had "quarantined some set level of inventory," claiming it was "defective." (Galante Dep., 199:2-3, 200:2-3.) Zeus was of the view that the damage resulted from customer misuse—specifically, placement of batteries in the wrong position, referred to as "reverse polarity"—that was remediable by way of a "battery pack configuration." (*Id*. at 91:3-19.) Zeus suggested such a "temporary fix" in a conference call on November 16. (*Id*. at 95:2-5; 96:8-17; 97: 9-20.) Specifically, Zeus proposed a configuration in which eight batteries would be placed in custom battery pack assemblies, so that there could be no "reverse polarity." (*Id*. at 96:5-97:24.) Zeus also pressed the proposal in e-mails to SWF, noting Zeus's belief that "the batteries are not at fault if installed properly." (Rendell e-mail Dec. 1, 2016, Exhibit D to AG 56.1 Resp. [19] at 15.) SWF never accepted this proposal, which Zeus believed would have remedied a problem that, in Zeus's view, is a defect in the SWF product design. (Galante Dep. 124:3-16; Bert Olson e-mail, Nov. 16, 2016, Exhibit D to AG 56.1 Resp.) Zeus also suggested a follow-up meeting, but SWF declined. (*Id*. 101:20-102:4; 106:10-16.) Galante believes that SWF sought to target Zeus batteries as the cause of defect in an effort to minimize SWF's own liability and reduce the scope of any resulting recall. (*Id*. 125:1-17.) In eliminating Zeus as a supplier and instead purchasing

batteries from Zeus's competitor, Galante believed, SWF was "throwing Zeus 'under the bus'" but not correcting the problem in SWF's own faulty product design. (*Id*. 159:6-20.)

Alarmed by SWF's communications, Zeus turned to its battery manufacturer and engineers. In a November 17, 2016 e-mail, Peter Foret of Zeus warned the supplier, "We are afraid that our customer [SWF] will take us and you to court and sue for possible damages." (Peter Foret e-mail, Nov. 17, 2016, Ex. D to GA 56.1 Resp.). Zeus personnel acknowledged that both Zeus and SWF were concerned that "this [a battery failure] could happen again." (Bert Olson e-mail Nov. 17, 2016, Exhibit D to GA 56.1 Resp.) Also on November 17, Zeus asked its battery supplier to "perform a Failure Analysis on the rejected units" to determine the cause of the failure and potential corrective action. (Peter Foret e-mail Nov. 17, 2017, Exhibit L to GA 56.1 Resp.) On November 19, 2016, as Zeus was poised to make additional shipments, SWF cancelled its order "for the time being." (Taylor Dalzin e-mail, Exhibit F to Zeus Resp. to GA 56.1 Add'l.) In a set of internal e-mails dated November 20, 2016, Zeus noted the possibility that "this is going to cost us the account as well as possible law suits." (Mills Rendell e-mail, Nov. 20, 2016, Ex. L to GA 56.1 Resp.)

On November 29, 2016, SWF cancelled its existing order for more inventory. (Id. 106:17-107:14.) Zeus responded the following day: On November 30, 2016, Mills Rendell sent a letter to SWF in which he pointed out that the Zeus batteries had been tested extensively and complied with all relevant safety standards. (Mills Rendell letter, Nov. 30, 2016, Exhibit G to Zeus Resp. to AG 56.1 Add'l.) Rendell noted that Zeus and the battery manufacturer had "analyzed the incident" (presumably a reference to the "catastrophic battery failure" in a display at a Menard's store) and had identified one potential cause: "reverse polarity insertion of a single battery cell." (Id.) He noted that the SWF design allowed for operation of the product even when the battery was installed improperly, which Zeus contends is inconsistent with industry safety standards.

On December 8, 2016, Zeus heard from Cuyler Cunningham for the first time; he is SWF's Executive Director for Global Procurement, and had not been Zeus's contact person before then.

(*Id.* 110:9-111:13.)  In a December 8, 2016 e-mail message, Cunningham notified Zeus that SWF would be replacing all of the Zeus batteries in any of its customer displays and expected Zeus to reimburse SWF for the cost of doing so ($119,165).  (Cunningham e-mail Dec. 8, 2016, Exhibit 3 to Rendell Decl. [19], page 19 of 48.)  Cunningham advised, further, that SWF would be returning $132,978 of inventory to Zeus.  (*Id.*)  Cunningham added that SWF still wanted to "give Zeus the opportunity to demonstrate" the quality of the batteries and that SWF was "willing to work with [Zeus] to requalify your product."  (*Id.*)

After consulting with counsel (Mills Rendell e-mail, Dec. 9, 2016, Exhibit M to GA 56.1 Resp.), Zeus's President Mills Rendell responded by "unequivocally reject[ing]" SWF's contention that the batteries were defective.  In an e-mail response to Cunningham, Rendell noted that SWF's design allowed the SWF product to operate regardless of whether or not the batteries are installed correctly and asserted that it was this misuse of the Zeus product and the SWF defective design, not the Zeus batteries, that caused the failure.  (Rendell E-mail Dec. 9, 2016, Exhibit 3 to Rendell Decl. [19] at 18 of 48.)[2]  Rendell notified SWF that Zeus is "not liable for any proper [sic] damage and/or personal injury caused by your misuse of our product," would not accept return of its inventory, and expected SWF to pay for the battery orders.  (*Id.*)

Zeus explained its position in more detail in a message from its Director of Sales, Herb Holmstedt, to Cuyler Cunningham: "The issue is not with the cells, the ZEUS cells are good.  The issue is with the cells being installed backwards in the SWF application." (Herb Holmstedt e-mail, Dec. 20, 2016, Exhibit N to GA 56.1 Resp.)  That backward installation is possible at all is, in Zeus's view, a design error, recognized as such "throughout the industry."  (*Id.*)  The next day,

---

[2]        In her post-deposition declaration, Gina Galante asserts that Zeus tested the SWF products after the communication from SWF on November 11 and determined that the SWF product design allowed the product to operate even when the batteries were installed incorrectly. (Galante Decl., Exhibit A to Zeus Resp. to GA 56.1 Add'l., ¶ 21.)  Ms. Galante says this is a design flaw referred to as "reverse-polarity" that violates industry standards.  (*Id.* ¶¶ 22, 23.)  She asserts, further, that "Zeus informed SWF promptly, at least as early as November 30, 2016, that it believed the cause of the incidents was improper reverse-polarity installation of the Zeus batteries."  (*Id.* ¶ 25.)

Holmstedt suggested to Mills Rendell that Zeus's attorney "send [SWF] a letter so they know . . . we're serious about fighting this." (Holmstedt e-mail Dec. 21, 2016, Exhibit O to GA 56.1 Resp.) There was no meaningful response from SWF. On January 26, 2017, Holmstedt sent an e-mail to Zeus personnel in which he said that Zeus is a "small company" and had "done nothing wrong," had provided batteries "of top quality," and believed SWF should pay the outstanding invoices and accept shipment of the rest of its order. (Holmstedt e-mail, Exhibit C to Zeus Resp. to GA 56.1 Add'l.) On that same day, Mills Rendell advised Holmstedt in an e-mail that Zeus "need[ed] to prepare for litigation." (Mills Rendell e-mail Jan. 26, 2017, Exhibit P to GA 56.1 Resp.)

Zeus received a more substantive response from Cunningham on January 31, 2017. Cunningham rejected Zeus's theory that the SWF design was at fault for battery failures; he noted that SWF had used batteries from other suppliers for ten years in SWF products of the same design but had not experienced such catastrophic failures, despite the likelihood that some of those competitors' products had also been installed backward. (Cuyler Cunningham e-mail, Jan. 31, 2017, Exhibit Q to GA 56.1 Resp.) Cunningham concluded that SWF would "treat Zeus's products as non-conforming" and would "not make further payment to Zeus," instead returning inventory in its possession. (*Id.*)

### B. Notice to Great American

Zeus first discussed the issue of insurance coverage with counsel on February 22, 2017. (Galante Dep., at 187:9-24.) Specifically, Zeus contacted its attorney, Robert Rosenfeld, whose web site identifies his focus as real estate law, but who also practices in the areas of commercial litigation, technology law, and business law. (Rosenfeld Web Site, Exhibit D to GA Resp. to Zeus Add'l.) Zeus consulted with an insurance agent, Mike Bulow, that same day. (Galante Dep. at 188:4-18.) Galante explained that until that time, Zeus had "very, very little to zero information" and that "there wasn't an issue to discuss with the insurance broker." (*Id*. 189:3-17.) Galante continues to believe that SWF's design was the reason for the failures (*id*. 190:7-21), and that it is not necessary to "alert the insurance company every time a customer calls in with a complaint

that their battery is not working." (*Id.* 192:9-13.) Galante pointed out that as of November and December, SWF had not requested that Zeus reimburse it for damage (*id.* 194:7-17), and that Zeus was awaiting feedback and test data from SWF. (*Id.* 194:18-195:8.)

SWF's Senior Vice President, John Comerford, followed up on February 24, 2017, announcing in a certified mail letter that SWF had initiated a recall of its products, and making a formal demand that Zeus indemnify it for all costs relating to the recall and "any other incidents involving the Zeus Batteries." (Comerford letter, Feb. 24, 2017, Exhibit 4 to Rendell Decl. [19], page 21 of 48.) Comerford's letter stated that SWF had "seen no evidence that the incidents described" in earlier correspondence "were caused by anything other than an unidentified latent defect in the Zeus Batteries." (*Id.*) Four days later, on February 28, 2017, Zeus sent its insurer, Plaintiff Great American, a copy of SWF's initial report to the Consumer Product Safety Commission, dated February 21, 2017, as well as the February 24, 2017 letter notifying Zeus of the product recall and demanding indemnification. (GA 56.1 Resp. [47] ¶ 19.) Great American acknowledged receipt of the claim but declined to provide a defense. (*Id.*)

## C. Litigation with SWF

On May 8, 2017, Zeus sued SWF in the Circuit Court of Cook County, alleging violations of Illinois law and seeking a declaration that the batteries it provided to SWF were in fact safe products and were not the cause of the incidents leading to a recall. (*Id.* ¶ 20.) Zeus had never before filed a lawsuit against any other company. (AG Resp. to Zeus Add'l. ¶ 10.) Zeus furnished a copy of the complaint to Great American on June 12, 2017. (GA 56.1 Resp. [47] ¶ 20.) SWF removed the case to this court and filed a counterclaim in which it alleges that there were defects in the Zeus batteries resulting in "at least five occasions" in which the batteries "exploded, leaked, caught fire, suffered a catastrophic deconstruction or otherwise malfunctioned while installed in a motorized window shade manufactured by SWF." (Answer and Counterclaim [14] in Docket No. 17 C 4382, ¶ 15.) Specifically, SWF identified these incidents:

- On June 7, 2016, a customer of Lowe's reported problems with the operation of an SWF Product, asserting that one of the battery tubes was so hot that it almost burned his hands and the batteries inside were charred and melted.

- On September 1, 2016, a customer of Diane's Draperies reported that a battery case exploded and that a window shade provided by SWF would no longer operate.

- On September 21, 2015, a customer of MJ Distributors reported that the batteries in an SWF shade leaked and damaged the case and window casing.

- On November 10, 2016, Menards reported that one or more batteries in an SWF product had a catastrophic deconstruction as a result of venting.

- On February 16, 2017, a customer of Gotcha Covered reported that the motorized blind it had purchased from SWF caught on fire and caused property damage and that two of the batteries had exploded after falling from the melted window shade.

Answer [14] in Docket No. 17 C 4382 ¶¶ 26, 28, 30, 32, 34. SWF's counterclaim against Zeus in the underlying litigation seeks damages in the amount of $130,000 for the cost of the Zeus batteries; $115, 000 to replace the defective batteries; and at least $1,000,000 in costs relating to the recall. (GA 56.1 Resp. [47] ¶ 32.)

SWF filed the Counterclaim on July 5, 2017; Zeus tendered it to Great American for defense on July 14, 2017. (*Id.* ¶ 34.) On September 15, 2017, Great American denied coverage and instituted this declaratory judgment suit. (*Id.* ¶ 35.) It is undisputed that Great American has a duty to defend Zeus against any lawsuit seeking damages for "property damage" caused by an occurrence," and that "property damage" is defined to include "physical injury to tangible property." (*Id.* ¶ 33; see also the Policy, Exhibit C to the Complaint [1] at § I, Coverage A, Paragraph 1.a.) What is disputed is whether these allegations in the underlying complaint constitute claims of "property damage" within the meaning of the GA insurance policy.

### D.  Coverage Dispute

In January 2018, Zeus's insurance agent received a "Policy Loss Report" from Great American and provided it to Zeus. The Policy Loss Report shows that Great American had assigned a claim number (A00121428) to the Counterclaim filed by SWF against Zeus. (GA

Resp. to Zeus Add'l. ¶ 1.)  The Policy Loss Report includes the following entries in the column for "Loss Description":

> PROPERTY DAMAGE:
> LAWSUIT ALLEGES INSURED[']S
> BATTERIES ARE DEFECTIVE
>
> PROPERTY DAMAGE:
> ALLEGES THAT BATTERY
> OPERATED SHADES CAUGHT
> FIRE AND DAMAGED

(*Id.* ¶ 2, 3; Policy Loss Report, Exhibit 2 to Galante Decl.)  As "Total Incurred," the report lists $104,800.00 for the first of these entries, and $40,645.36 for the second, resulting in a "Total for Policy" of $145,445.36.  (GA Resp. to Zeus Add'l. ¶ 4; Policy Loss Report.)  On January 23, 2018, Great American advised Zeus by letter that it had paid $12,933.24 for losses and $27,535.72 for expenses on the Ritchie Claim, No. A000094042, leaving Zeus obligated to pay the deductible of $2,500.00.  (GA Resp. to Zeus Add'l. ¶ 5; Michelle Daughtery Letter, Jan. 23, 2018, Exhibit 1 to Galante Decl.)

Zeus, a family-owned company, does not have an in-house counsel position, though its vice-president has a law degree and was admitted to the bar thirty years ago.  (GA Resp. to Zeus Add'l. ¶¶ 6, 7.)  As described earlier, Zeus first consulted a lawyer concerning its dispute with SWF on December 8 or 9, 2016.  Gina Galante explained in her deposition that Zeus wanted the advice of its attorney, Rob Rosenfeld, concerning a "precise response back to [SWF] showing that our product is not at fault and that they have a financial obligation."  (Galante Dep. at 131:11-22.)  Zeus did not notify its insurer in November 2016, Galante explained, because Zeus was "further investigating" the matter of the Menards battery failure.  (Id. at 191:4-21.)  She noted that at that time, "it [was] merely a claim on a leaking battery," and SWF had not asked Zeus to "pay for the cost to replace whatever it was in the Menard store."  (*Id.* at 194:7-13.)  Nor did Zeus contact its insurer in December 2016; Galante noted that Zeus had "gained no additional test data from the customer" by then, and still had no reason to believe the Zeus battery, rather than reverse

polarity, was the cause of the incident. (Id. 194:18-195:8.) When Zeus did notify Great American of the SWF claim, it was, to Gina Galante's knowledge, the first time that Zeus had ever reported a claim or potential claim to an insurer. (Galante Dep. at 17:8-16.) In a letter dated March 23, 2017, Great American acknowledged receipt of Zeus's claim, but noted that SWF had not filed a claim or lawsuit for damages; the fact that SWF had proposed a recall of the product "does not trigger coverage or defense under [Zeus's] policy." (Andrew Herbert letter, March 23, 2017, Exhibit G to GA Resp. to 56.1.)

## DISCUSSION

In this litigation, Great American seeks a declaration that it has no duty to defend Zeus against any claims brought in Zeus's litigation with SWF for two reasons: First, Great American argues that the Counterclaim filed against Zeus does not seek compensation for losses "because of" "property damage" caused by "an occurrence" within the meaning of the policy. Second, Great American urges, Zeus failed to provide Great American with timely notice of the potential claim. Both parties have moved for summary judgment, appropriate only where the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The non-moving party can defeat such a motion by presenting "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Where parties file cross-motions for summary judgment, the applicable standard does not change; courts "take the motions one at a time and then, as usual, construe all facts and draw all reasonable inferences in favor of the non-moving party." *Advance Cable Co. v. Cincinnati Ins. Co.,* 788 F.3d 743, 746 (7th Cir. 2015).

As both parties acknowledge, the substance of Plaintiff's claim is governed by Illinois state law. *See* Zeus Motion for Summary Judgment [17] at 6 n.3; Great American Motion for Summary Judgment [44] at 4; *see also Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.,* 521 F.3d 743, 746 (7th Cir. 2008). In insurance coverage disputes under Illinois law, "underlying complaints and the insurance policies must be liberally construed in favor of the insured," *U.S. Fid. & Guar.*

*Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 74, 578 N.E.2d 926, 930 (1991), and the "construction of an insurance policy is a question of law," not fact, *Milwaukee Mutual Ins. Co. v. J.P. Larsen, Inc.*, 2011 IL App (1st) 101316,956 N.E.2d 524, 527 (2011). Thus, in ruling on both motions for summary judgment, the court construes the allegations of the underlying complaint and the insurance policy itself in favor of Zeus, the insured. *Westfield Ins. Co. v. Nat'l Decorating Serv., Inc.,* 863 F.3d 690, 695 (7th Cir. 2017) (citing *Wilkin Insulation,* 144 Ill.2d at 74, 578 N.E.2d at 930).[3]

## I.     Property Damage

The court turns, first, to the question of whether the claims asserted in SWF's Counterclaim fall within the scope of the Policy. Under Illinois law, "[t]he duty to defend is triggered if the allegations in the underlying complaint fall within, or potentially within, the policy's coverage . . . even if the allegations are groundless, false, or fraudulent, and even if only one of the several theories of recovery alleged in the complaint falls within the potential coverage of the policy."[4]

*Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill.2d 352, 363, 860 N.E.2d 307, 315 (2006). Thus, an insurer may justifiably refuse to defend a lawsuit against its insured only where "it is

---

[3]     Illinois practice differs somewhat; in Illinois courts, when parties file cross-motions for summary judgment, "they concede the absence of a genuine issue of material fact and invite the court to decide the questions presented as a matter of law." *Steadfast Ins. Co. v. Caremark Rx, Inc.*, 359 Ill. App. 3d 749, 755, 835 N.E.2d 890, 896 (2005). Federal law governs in this case. *Cf., e.g.*, *Shropshire v. Laidlaw Transit Inc.*, 550 F.3d 570, 574 (6th Cir. 2008) (holding that the federal summary judgment rule applies "even where the federal summary judgment requirements displace state law that would require a jury to make a particular determination").

[4]     Great American contends the Seventh Circuit has carved out a significant exception to this rule, holding, in *Westfield Insurance Co. v. National Decorating Service, Inc.*, that where a plaintiff lacks standing to pursue a claim brought against a policyholder, "these allegations are insufficient to trigger the duty to defend." 863 F.3d at 696. That case, however, addressed the duty to indemnify, not the duty to defend. The *Westfield* court cited *Allied Property & Casualty Insurance Co. v. Metro North Condominium Association*, where the court had held the duty to indemnify was not triggered as to certain claims that the plaintiff lacked standing to pursue. 850 F.3d 844, 849 (7th Cir. 2017). No Illinois case of which this court is aware exempts claims with standing issues from the general rule that insurers must defend even against "groundless, false, or fraudulent" claims. *Valley Forge*, 223 Ill.2d at 363, 860 N.E.2d at 315.

clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage of the policy." *Id*. (citing *General Agents Ins. Co. of America v. Midwest Sporting Goods Co*., 215 Ill.2d 146, 828 N.E.2d 1092 (Ill. 2005)). Yet, "[w]hile the duty to defend is broad, the duty is not limitless." *Westfield*, 863 F.3d at 695. It arises "only if the insured's activity and the resulting loss or damage actually fall within the . . . policy's coverage." *Allied Prop. & Cas. Ins. Co. v. Metro N. Condo. Ass'n*, 850 F.3d 844, 847 (7th Cir. 2017) (quoting *Traveler's Ins. Co. v. Eljer Mfg., Inc*., 197 Ill.2d 278, 294, 757 N.E.2d 481, 491 (Ill. 2001)). In assessing whether this test is met here, the court examines the relevant language of the Policy, and then considers whether the Counterclaim falls "potentially within" the type of lawsuit the Policy describes. *See generally Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314 ("To determine whether an insurer has a duty to defend its insured from a lawsuit, a court must compare the facts alleged in the underlying complaint to the relevant provisions of the insurance policy.").

## A. The Policy

Great American's policy with Zeus provides that it will "pay those sums that the Insured becomes legally obligated to pay as damages because of . . . 'property damage'" caused by an "occurrence." (Complaint [1] Ex. C (hereinafter, "Policy"), at § 1, Coverage A, ¶¶ 1a, 1b(1).) This provision includes three terms relevant to determining whether the Policy applies to the Counterclaim: "property damage," "occurrence," and "because of." In analyzing each of these terms, the court is guided by rules of interpretation laid out by the Illinois Supreme Court. Specifically, where "words used in the policy, given their plain and ordinary meaning, are unambiguous, they must be applied as written." *Valley Forge*, 223 Ill.2d at 363, 860 N.E.2d 307, 314. But where words are "reasonably susceptible to more than one interpretation," "they will be strictly construed against the drafter." *Id.*

The Policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." (Policy at § 5, ¶ 17). Illinois courts hold that this generally

includes damage to any tangible property other than that which is produced by the insured party. *See W.E. O'Neil Const. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 721 F. Supp. 984, 991 (N.D. Ill. 1989) (applying Illinois law and citing Illinois cases).  Zeus concedes this limitation.  (Zeus M.S.J. [17] at 9 ("Zeus is not arguing that damage to the Subject Battery itself amounts to "property damage" under the Policy.").)  Thus, "tangible property" in this context refers only to property that is not produced by Zeus.

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Policy at § 5, ¶ 13.)  The parties do not engage significantly with this term.  Great American cites, but does not discuss, a case from this district holding that the term "accident" excludes events foreseeable to the insured party, and noting that product defects are inherently foreseeable.  *Catlin Specialty Ins. Co. v. Parks Indus., LLC*, No. 14-CV-727, 2015 WL 300625, at *3 (N.D. Ill. Jan. 21, 2015).  That said, the word "accident" does not exclude every event that may be foreseeable.  In *United States Fidelity and Guaranty Co. v. Wilkin Insulation Co.*, an Illinois appellate court considered the term "accident" in a similar context: where an insurance policy defined "occurrence" as "an accident including continuous or repeated exposure to conditions which result in property damage or bodily injury, neither expected nor intended from the standpoint of the insured."  193 Ill.App.3d 1087, 1097, 550 N.E.2d 1032, 1038 (1st Dist. 1989), *aff'd*, 578 N.E.2d 926 (Ill. 1991).  In *Wilkin Insulation*, the defendant insured party allegedly exposed several school districts and building owners to "continuing physical harm" by using asbestos-containing materials in constructing buildings.  *Id.* at 1091, 1096  550 N.E.2d at 1034, 1038.  The court held that this allegation sufficiently charged an "occurrence," noting that there was "no evidence that the defendants foresaw the detrimental effects of the asbestos prior to the installation," and that "any ambiguity with respect to whether the installation was an 'occurrence' or an 'accident' must be resolved in favor of the insured."  *Id.* at 1097, 550 N.E.2d at 1038-39.  Here, "accident" is defined even more liberally (omitting the

qualifier "neither expected nor intended from the standpoint of the insured"), and there is similarly no evidence or allegation that Zeus foresaw its batteries causing property damage.

To suggest that any incident that could have been foreseen is excluded from coverage would effectively eliminate coverage in most negligence actions. This cannot be what the parties intended when drafting the policy. *See generally Country Mut. Ins. Co. v. Livorsi Marine, Inc*., 222 Ill.2d 303, 311, 856 N.E.2d 338, 342-43 (2006) ("When construing the language of an insurance policy, a court is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy.") The court therefore construes "accident" in this context as any event that was not specifically foreseen by the insured party.

The Policy does not elaborate on precisely what the "because of" term means. Zeus appears to believe the term requires no more than a sort of but-for causation between the property damage and the complaint. *See* (Zeus M.S.J. [17] at 8.) Great American insists that the term requires a closer relationship, contending that the property damage must be "directed to a theory of recovery," such that only a claim brought to compensate a plaintiff for the property damage itself is a claim brought "because of" the property damage. (Great American M.S.J. [44] at 6.) Thus, in Great American's view, property damage that is not itself part of the injured party's damage calculation is "tangential" to the relevant claim and not covered under the Policy. (Great American M.S.J. [44] at 7.)

The most significant authority Great American cites in support of this construction is *Amerisure Mut. Ins. Co. v. Microplastics, Inc*., 622 F.3d 806 (7th Cir. 2010). In *Microplastics*, a case governed by Illinois law, Microplastics was sued by a customer who alleged that Microplastics had sold defective parts; there was "no indication that [Microplastic]'s products caused damage to any property other than the defective products themselves." 622 F.3d at 808. Microplastics tendered the defense to its insurer under a policy similar to this one, providing coverage for any legal liability resulting from "'property damage' or 'personal injury' caused by an 'occurrence.'" *Id.* at 809. Because Microplastics' customer had made "only general allegations

for costs incurred as a result of defective products," the court affirmed the district court's determination that Microplastics's insurer had no duty to defend. *Id.* at 811. The fact that the customer did not "explicitly disavow[] any claim for damage to property other than the defective products themselves," was not enough, in the court's view, to support Microplastics's speculation that there may have been damage to other property as well, as it must in order to qualify as "property damage." *Id.* The *Microplastics* case confirms that that to trigger a duty to defend the underlying complaint must allege damage to tangible property other than the defective product itself. *Microplastics* does not establish, as Great American contends, that coverage is unavailable unless such damage is the only basis for a claim against the insured party.

More recently, in *Berry Plastics Corp. v. Illinois Nat'l Ins. Co.*, 903 F.3d 630, 639 (7th Cir. 2018), the Seventh Circuit addressed this issue, where the dispute involved the duty to indemnify under Indiana law (a duty broader than the duty to defend). In *Berry Plastics*, the insured party had been ordered to pay for lost profits caused by defective foil laminate it supplied. *Id.* at 637. Because the policy at issue covered "damages that [the insured party] is required to pay 'because of . . . Property Damage,'" the Seventh Circuit analyzed the phrase "because of" in order to determine whether the duty to indemnify had been triggered. *Id.* at 632, 640. Specifically, it considered whether "'because of' should be taken to connote the same sort of causal, 'but for' meaning it carries in tort law," or whether it should instead be read to cover only damages that "constitute[] a measure of the property damage caused by the defective product," thus excluding secondary harms like, in that case, lost profits. *Id.* at 637. Drawing on Indiana case law, the policy language, and common-law tort law, the Seventh Circuit determined that an "ordinary understanding of the phrase 'because of' would include a broad array of consequential damages, not simply those that constitute a measure of the injury to the property itself." *Id.* at 639. Thus, it held that the "because of" phrase required only that the insured show "a causal relationship between the property damage and [the] losses." *Id.* at 640. In other words, for an insurance

policy covering damages sought "because of property damage" to be triggered, it is sufficient that a plaintiff allege harm that is connected to property damage via a "causal relationship." *Id.*

In interpreting the "because of" policy language, *Berry Plastics* cited to *Cincinnati Insurance Co. v. H.D. Smith, L.L.C.,* a duty-to-defend case applying Illinois law. 829 F.3d 771 (7th Cir. 2016). There, the Seventh Circuit noted that a policy insuring against damages "because of bodily injury" provides "broader coverage than one that covers only damages 'for bodily injury,'" such that a policy with the "because of" term would cover not only a paralyzed individual's medical costs, but also the costs of "making [the individual's] house wheelchair accessible." *Id.* at 774 (*quoting Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 616 (7th Cir. 2010)).

The *Berry Plastics* court relied, in addition, on another case applying Illinois law: *Wausau Underwriters Insurance Co. v. United Plastics Group*, *Inc.*, 512 F.3d 953 (7th Cir. 2008). *Wausau Underwriters* was a case about the duty to indemnify, where the insured party (UPG) had manufactured defective water chambers that were incorporated into another company's (Microtherm's) water heaters. *Id.* at 955. Once the water heaters were sold to customers, many of them ruptured, damaging customers' carpets and other property on their premises. *Id.* Microtherm sued UPG, alleging that these incidents caused a "big fall off in its business," and won an award of damages equal to the cost of replacing the water heaters, plus lost profits and some punitive damages. *Id.* at 955-56. Following this verdict, UPG's excess liability insurer (Ohio Casualty) sought a declaratory judgment in the Northern District of Illinois that its insurance policy, which covered "sums that the insured 'becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . property damage . . . caused by an occurrence,'" did not cover the judgment. *Id.* at 956 (alterations in original). The district court held the insurer liable for the full amount. *Id.* at 955. On appeal, the Seventh Circuit agreed "that property damage had occurred . . . when leaking water from the defective heating chambers either shorted out the heaters' circuit boards or spoiled consumers' floors," but remanded for a determination of whether that property damage actually caused the lost profits that comprised most of the damages

obtained. *Berry Plastics*, 903 F.3d at 641 (construing *Wausau Underwriters*). In other words, the court held that if Microtherm suffered lost profits because of damage caused by UPG's product to "either . . . the heaters' circuit boards or . . . consumers' floors," those losses were "because of property damage" within the meaning of the insurance policy. *Id.* ("*Wausau* makes clear that whether the Illinois National policy covers an award of such business losses depends on whether those losses were specifically due to property damage . . . ."). *Wausau Underwriters* and *Berry Plastics* thus confirm that where a lawsuit is filed for business losses caused by property damage, then that complaint seeks damages "because of property damage," *even if* the property damage was not to the plaintiff's own property.

Great American argues that *Berry Plastics* is inconsistent with Illinois law; Great American asserts that two of the Illinois cases on which it is premised—*Cincinnati Insurance* and *Wasau Underwriters*—involved plaintiffs who "sued the insured to seek damages because of damage or injury the *claimant* sustained." (Great American Supp. Brief [71] at 6 n.4.) To the extent Great American is claiming that the plaintiff in *Wausau Underwriters* sought damages because of property damage it suffered itself, the court disagrees. The *Wausau Underwriters* court acknowledged only two kinds of property damage present in the underlying case: (1) that done to circuit boards in water heaters already purchased by consumers, and (2) that done to consumers' carpets and personal property. Neither were damage done to Microtherm's property.

Great American does not cite any Illinois authority affirmatively supporting its proposed reading of the "because of" term: that a policy covering damages suffered "because of" property damage is restricted to lawsuits brought by the owners of the damaged property. Moreover, even if this court were persuaded to disregard *Berry Plastics* and *Wausau Underwriters*, it would have no option but to find the term ambiguous, at which point the term would be "strictly construed against the drafter." *Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314. This court concludes that damages sought "because of" property damage includes consequential damages

precipitated by property damage, including those that do not affect the plaintiff's own tangible property.

## B.    The Counterclaim

With these principles in mind, the court turns to the Counterclaim.  SWF alleges, inter alia, that "defects in the Zeus batteries" caused at least five "incidents" in which "Zeus' Batteries exploded, leaked, caught fire, suffered a catastrophic deconstruction or otherwise malfunctioned while installed in a motorized window shade manufactured by SWF."[5]  (Complaint [1] Ex. B, at ¶¶ 15-16.)[6]  In the first incident, a non-party customer found a battery tube to be "so hot that it almost burned his hands" and "the batteries inside were charred and melted."  (*Id*. at Ex. A, ¶ 26.) In the second incident, another non-party customer "allegedly reported that a battery case exploded and that the window shade would no longer operate."  (*Id*. at Ex. A, ¶ 28.)  In the third incident, yet another non-party "allegedly reported that the batteries in one shade leaked and damaged the case and window casing."  (*Id*. at Ex. A, ¶ 30.)  In the fourth incident, a distributor "allegedly reported that one or more batteries had a catastrophic deconstruction as a result of venting." (*Id*. at Ex. A, ¶ 32.)  And in the fifth incident, a customer alleged that one of SWF's blinds "caught on fire and caused property damage and that two of the batteries had exploded after falling from the melted window shade."  (*Id*. at Ex. A, ¶ 34.)

All five of these incidents were caused by an "occurrence" in that they were precipitated by malfunctions unforeseen by Zeus.  Great American appears to be correct that the first, second, and fourth incidents do not qualify as "property damage," because they allege only damage to

---

[5]    The court notes that with regard to at least one of these incidents, a "catastrophic battery failure" in a Menard's store display, Zeus was given notice of its existence in November 2016.

[6]    The parties agree that SWF did not immediately inform Zeus of these first three incidents, although a November 2016 email message to Zeus mentioned three prior "concerns" involving leaking batteries, presumably the three incidents described in the complaint.  *See* Facts, *supra*, at Section A.  The parties agree that SWF informed Zeus of the fourth incident shortly after its occurrence in November 2016, and SWF informed Zeus of the fifth incident shortly after its occurrence in February 2017.  *See id*.

batteries produced by Zeus.  The third and fifth incidents, however, properly construed in favor of Zeus, do describe "property damage"; both involve damage to property other than the batteries themselves: the third alleging damage to a window casing, and the fifth alleging that a window shade melted and that additional unspecified property damage occurred.[7]

The remaining issue is whether the SWF counterclaim seeks damages "because of" either of these two incidents.  SWF does not specifically allege that it seeks damages to repair or replace damaged SWF products.  Instead, SWF asks for an award of "at least $1,000,000" for costs it incurred in "coordinating with the Consumer Product Safety council to recall its motorized window shades equipped with Zeus's batteries," as well as unspecified damages sustained to its reputation as a result of "Zeus's provision of non-complying Batteries."  (Complaint [1] Ex. A, at ¶¶ 22-23.)  Construed liberally in Zeus's favor, both allegations describe harms that were precipitated by the property damage described above.  At least some of the recalled SWF products were plausibly those already damaged by batteries, and proof of the reputational harms will likely involve evidence that the batteries caused damage to a customer's property.  This interpretation is bolstered by the allegation elsewhere in the complaint that "SWF incurred expenses associated with . . . replacing SWF's products and issuing a product recall."  *Id*. at ¶ 60.  Under *Berry Plastics* and *Wausau Underwriters*, this suffices to fit the allegations at least "potentially within" the Policy's language, triggering Great American's duty to defend.  Given the deference in favor of the insured, the court concludes Zeus is entitled to summary judgment on this issue.

## II.    Notice

What remains is Great American's argument that Zeus failed to provide timely notice of SWF's claim.  (Great American M.S.J. [44] at 12.)  In Illinois, insured parties must comply with

---

[7]    Great American also briefly argues that coverage is precluded because, it claims, SWF seeks only damages for the defectiveness of the batteries themselves, and therefore the "business risk exclusion" applies.  *See* Great American M.S.J. [44] at 12.  This argument has no merit, as the Counterclaim plainly alleges property damage to SWF products.

notice provisions as a prerequisite to insurance coverage. *Livorsi Marine*, 222 Ill.2d at 311, 856 N.E.2d at 343. The notice provision in Great American's policy provides that an insured party "must see to it that we are notified as soon as practicable of an occurrence which may result in a claim or suit which may involve this policy" including, "to the extent possible": "how, when and where the occurrence took place," "the names and addresses of any injured persons and witnesses," and "the nature and location of any injury or damage arising out of the occurrence." (Policy at ¶ VI.H.1.) In this context, the Illinois Supreme Court has held that "[a]s soon as practicable" means "within a reasonable time," and noted, "[w]hether notice has been giving within a reasonable time depends upon the facts and circumstances of each case." *Livorsi Marine*, 222 Ill.2d at 856 N.E.2d at 343 (quoting *Barrington Consol. High Sch. v. Am. Ins. Co.*, 58 Ill.2d 278, 281, 319 N.E.2d 25, 27 (Ill. 1974)). In assessing the reasonableness of the time for providing notice to an insurer, Illinois courts consider five factors: "(1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer." *West Am. Ins. Co. v. Yorkville Nat. Bank*, 238 Ill.2d 177, 185-86, 939 N.E.2d 288, 293-94 (2010). None of these factors are individually dispositive to the reasonableness test, which the Seventh Circuit has characterized as a "totality-of-the-circumstances analysis."[8] *State Auto Prop. & Cas. Ins. Co. v. Brumit Servs., Inc.*, 877 F.3d 355, 358 (7th Cir. 2017) (citing *Livorsi Marine,* 222 Ill.2d at 316-17, 856 N.E.2d at 346)).

---

[8] Great American contends that, separate from this analysis, especially lengthy delays are unreasonable as a matter of law. (Great American M.S.J. [44] at 16). This is inconsistent with *Livorsi Marine*, which first set forth the multi-factor "reasonableness" test in which no one factor is dispositive. 222 Ill. 2d at 313, 856 N.E.2d at 338. The insurer in *Livorsi Marine* argued that the "lengthy delay, without an excuse . . . was unreasonable as a matter of law," an argument the Illinois Supreme Court did not adopt in its holding. *Id.* at 308, 856 N.E.2d at 341. Regardless, Great American has not satisfied the court that the delay in this case is "especially lengthy," and the court does not find that it is unreasonable as a matter of law.

The facts on this issue are not disputed, and the court therefore will "apply Illinois law to the undisputed facts of this case." *State Auto Prop. & Cas. Ins. Co. v. Brumit Servs., Inc.*, 877 F.3d 355, 357 (7th Cir. 2017). When, in *State Auto*, the Seventh Circuit was faced with a similarly situated duty-to-defend case applying Illinois law—that is, one where facts were undisputed and the parties filed cross-motions for summary judgment—it reversed the district court's grant of summary judgment to the insured party and directed it to enter judgment for the insurer, because all five *Yorkville* factors tilted in favor of one party. *Id.* at 358. Here, the court concludes that each of the five factors are either neutral or tilt in Zeus's favor, and Zeus is therefore entitled to summary judgment on this issue.

The subject of the first factor—the policy language—"does not aid in our reasonableness analysis because it does not identify a specific time frame for giving notice." *Yorkville*, 238 Ill.2d at 186, 939 N.E.2d at 294. Rather, the Policy requires that the insured party notify the insurer of an "occurrence" "as soon as practicable." (Policy at § IV.2.a.) This terminology does not favor either party; whether Zeus gave notice "as soon as practicable" is informed by the court's assessment of the remaining factors.

The second factor—the insured party's sophistication—favors Zeus. Zeus, a battery distributor, has never filed a lawsuit against any other company. It therefore bears little resemblance to the defendant in *Yorkville*, which was "presumed to be sophisticated in the areas of commerce and insurance" because it is a bank. 238 Ill.2d at 186, 939 N.E.2d at 294. In *MHM Services Inc. v. Assurance Co. of America*, the Illinois appellate court found an insured party to be sophisticated because it (1) retained a part-time and later a full-time general counsel, (2) retained coverage counsel, (3) had the benefit of local litigation counsel, and (4) had cash on hand to pay litigation expenses. 2012 IL App (1st) 112171, ¶ 64, 975 N.E.2d 1139, 1159. In contrast, Zeus has no in-house counsel, and the first attorney it consulted regarding the issue of insurance coverage, Robert Rosenfield, does not identify as focusing either in insurance law or

litigation generally. There is no evidence that Zeus has cash on hand for litigation expenses; the fact that it has never before initiated commercial litigation suggests otherwise.

The third factor is the insured's awareness of an event that may trigger insurance coverage. Although the court has concluded that Zeus was aware of a relevant occurrence in November 2016, no evidence in the record suggests that Zeus understood that this would trigger insurance coverage prior to February 22, 2017. Galante affirmed when deposed that, prior to that point, Zeus had "very, very little to zero information" and was under the impression that it was not necessary to "alert the insurance company every time a customer calls in with a complaint that their battery is not working." As late as December, SWF's Executive Director for Global Procurement informed Zeus that SWF was "willing to work with [Zeus] to requalify your product," suggesting no litigation was pending. And prior to February 2017, SWF had specifically described only one battery-related incident to Zeus, with the three others only alluded to over e-mail. Absent evidence that Zeus was informed prior to February that the battery incident was likely to result in litigation, this factor tilts in Zeus's favor.

The fourth factor is the insured's diligence is ascertaining whether coverage is available. This factor takes into account the insured party's justification for any delay; under some circumstances, even multi-year delays may be found reasonable. *See Yorkville*, 238 Ill.2d at 187, 939 N.E.2d at 294 (collecting cases). The delay in this case did not exceed four months, and the weight of evidence suggests that Zeus was not aware of the pendency of litigation prior to February 22, 2017, when it first discussed insurance coverage with Rosenfeld. Four days later, it provided notice to Great American. The fourth factor tilts in Zeus's favor.

The fifth and final factor considers whether the insurer suffered prejudice as a result of a delay in notice. There is no evidence of prejudice to Great American in this case. Great America received notice four months before SWF filed its Counterclaim. Great American speculates that "perhaps" it "would have been able to evaluate whether Zeus should recall its product or otherwise try to prevent additional incidents and/or explore an early settlement to avoid a lawsuit."

Speculation does not substitute for evidence of prejudice. The court concludes that Zeus prevails on this issue as well.

Although "length of delay" is not a delineated *Yorkville* factor, it bears note that the only case Great American cites where a court found a delay as short or shorter than four months to be unreasonable is a case decided more than sixty years ago, involving a car accident. *See Hawkeye-Sec. Ins. Co. v. Myers*, 210 F.2d 890 (7th Cir. 1954). In view of the presumption that the court should construe the insurance policy strictly against the insurer, Zeus is entitled to summary judgment on the issue of notice.

### III.     Scope of Duty to Defend

Great American's duty to defend extends to all of the claims in SWF's countersuit. *See Pekin Ins. Co. v. Wilson*, 237 Ill. 2d 446, 453, 930 N.E.2d 1011, 1015 (2010) (noting that "if [the insurer] has a duty to defend as to at least one count of the lawsuit, it has a duty to defend in all counts of that lawsuit"). Whether Great American's policy requires it to prosecute Zeus's affirmative claim against SWF is more complicated. Another court in this district has observed that the duty to defend "encompass[es] all litigation by which the insured could defeat its liability." *Great W. Cas. Co. v. Marathon Oil Co.*, 315 F. Supp. 2d 879, 882-83 (N.D. Ill. 2003) (applying Illinois law). Illinois courts have since expressly approved of this proposition, finding that the duty to defend extends to affirmative cases seeking third-party contribution and indemnification. *Selective Ins. Co. of the Se. v. Creation Supply, Inc.*, 2017 IL App (1st) 161899-U, ¶¶ 42-43.

Zeus brought suit against SWF for a declaratory judgment that Zeus's batteries are safe and not the cause of the alleged incidents. These circumstances are somewhat unusual, but the court is guided by *Great West*'s holding that "claims which, if successful, have the effect of reducing or eliminating the insured's liability" are "'defensive' claims . . . encompassed in an insurer's duty to defend." *Great West*, 315 F. Supp. at 881. The dispositive question is therefore whether Zeus's affirmative claim would, if successful, have the effect of reducing or eliminating its liability to SWF. *Id*.

Great American expressly concedes that "[a]ny declaration Zeus Batteries were safe would . . . bind SWF and prohibit SWF from collecting its recall costs." (Great American M.S.J. [44] at 9.) This would, of course, reduce or eliminate Zeus's liability to SWF. This is alone enough to decide the issue. Moreover, to the extent that there is any ambiguity as to whether the Policy covers affirmative suits, Illinois courts have held that "[a]ny ambiguity arising from the definition of 'suit' is strictly construed in favor of the insured and against the insurer that drafted the policy." *Selective Ins. Co. of the Se. v. Creation Supply, Inc.*, 2017 IL App (1st) 161899-U, ¶ 39. Though the specific amounts Zeus spent in seeking affirmative relief may be subject to challenge, the court concludes that Great American's policy requires it to both pursue Zeus's affirmative claim against SWF and defend against SWF's counterclaims.

## CONCLUSION

The court concludes that Plaintiff Zeus Battery Products is entitled to defense in the claims asserted by SWF.

ENTER:

Dated: December 20, 2018

_____

REBECCA R. PALLMEYER
United States District Judge